*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

STEPHEN ALLEN KYLES,

        Defendant-Appellant.

UNPUBLISHED
April 13, 2026
9:06 AM

No. 370438
Berrien Circuit Court
LC No. 2022-002890-FH

Before: O'BRIEN, P.J., and FEENEY and WALLACE, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial conviction of operating while intoxicated (OWI), third offense, MCL 257.625(1)(b) and (9)(c). We affirm.

## I. BACKGROUND

Officer Jacob Michael Clark with the Benton Harbor Department of Public Safety testified that he was working in the early morning hours of September 11, 2022, when a call came in at 2:21 a.m. asking for officers to respond to an accident. When Clark arrived at the scene, he "saw a GMC Terrain flipped up onto a[n] embankment" on its passenger side. Clark made his way to the vehicle and found Shurrone Richmond inside. It appeared to Clark that Richmond was stuck in the vehicle near the passenger side. A "windshield saw" was eventually used to "cut out the windshield," and Richmond was pulled "through the front windshield of the vehicle." Defendant was outside of the vehicle all this time—according to Clark, when he arrived at the scene, defendant was behind the vehicle.

Clark testified that, while Richmond was being removed from the vehicle and loaded onto a stretcher, Clark heard defendant mention that Richmond was "his girl." This led Clark to ask defendant if he was the driver of the vehicle, and defendant said that he was. Clark believed that defendant was intoxicated because defendant's speech was slurred, and he smelled of alcohol, but defendant denied to Clark that he had any alcohol that night.

Clark testified that he had defendant perform several field sobriety tests, all of which defendant failed, so Clark took defendant into custody. While being taken to Clark's police

vehicle, defendant made several incriminating statements, including "I'm going to jail for drinking and driving, I have to accept that," and "I fucked up." Defendant also said that someone turned in front of him and he tried to avoid it.

Clark placed defendant into the vehicle, and defendant's conduct in the vehicle was captured by an in-car camera. This entire video was entered into evidence, but only parts of it were played during trial. During one part of the video that was played for the jury, defendant says, "I ain't gonna lie to you bro, I know I fucked up because I still got behind a wheel and I'm still drinking." Defendant also again mentioned that someone turned in front of him, and he had to "avoid" hitting them. According to Clark, once at the station, officers used a DataMaster to test defendant's blood alcohol level, and the result of those tests were a 0.16 and 0.15. Clark testified that defendant never denied that he was the driver or said that he was not the driver. Clark also testified that he interviewed Richmond over the phone the day after defendant was arrested and interviewed her in person 15 days later.

Richmond was supposed to testify on defendant's behalf at his trial, but she passed away before the trial took place. Richmond had previously testified at defendant's preliminary examination, however, and the parties agreed to admit Richmond's testimony from the preliminary examination with redactions. A video of Richmond's preliminary examination testimony was played for the jury, and that video has been provided to this Court on appeal.

Richmond testified that defendant was her boyfriend, and she was out with him celebrating his birthday on the night he was arrested. According to Richmond, she and defendant were at a bar together, but they "got into it a little bit" and left separately. Richmond testified that she left first and got into defendant's 2016 GMC Terrain, and she texted defendant to come out or she would leave without him. Defendant, according to Richmond, believed that Richmond had in fact left without him, so defendant left with someone else, and Richmond eventually met back up with defendant at a nearby party store. Richmond testified that, at this party store, defendant got into the passenger seat while Richmond remained in the driver's seat.

After they left the party store together, they were involved in a car accident. According to Richmond, something jumped in front of the car, and she hit the gas instead of the brakes, causing the car to swerve and roll over. Defendant was able to crawl out the back, but Richmond remained inside. She was still there when she made contact with police. By this time, according to Richmond, she was near the center of the vehicle towards the passenger side because she had managed to unbuckle her seatbelt, and the car was tipped towards the passenger side. Richmond testified that she was eventually pulled out of the vehicle through the windshield. Thereafter, the police never asked Richmond if she was the driver, so she never told them that she was. Richmond testified that she spoke to police at a later date and told them that she was the driver that night "because [she] was." Richmond also said that she spoke to an officer on the phone and told him that she was the driver. When asked why she did not tell officers sooner, Richmond explained that officers never asked her, and she was hurt during the accident and was more concerned with getting her injuries treated.

Upon questioning by the trial court, Richmond testified that, when she was taken to the ambulance after being removed the car, she did not see defendant talk to police or get arrested. Richmond reiterated that the police did not ask her anything—they merely got her out of the car

and helped her get to the ambulance. Richmond testified that she found out that defendant had been taken to jail while she was in the hospital. Richmond found out when she saw defendant the next day that he had been arrested for drunk driving, and she "asked him how did he go to jail for drunk driving and I was driving." The court then asked Richmond why she did not then call the police and tell them that she was the one driving, and Richmond said, "I don't know." Richmond explained that she did talk to them on the phone, but she could not explain why she did not call them and tell them that she was the driver.

Defendant also took the stand in his defense. Defendant testified that, on the night he was arrested, he and Richmond were out celebrating defendant's birthday. According to defendant, Richmond agreed to go "to a club" with him, but when they got there, Richmond decided that she did not want to go in, so defendant went in by himself. When he came out, his car was gone and he assumed Richmond had left, so he texted her and asked her to pick him up at a nearby party store. Defendant testified that, when Richmond came to pick him up, he got into the passenger seat of the car with Richmond driving, and the crash occurred "maybe two blocks" from the party store. Defendant managed to crawl out "the back hatch" while Richmond was still suspended in the driver's seat.

According to defendant, when Officer Clark first approached the car, "he was playing on his phone," and defendant told him that someone was trapped in the car, in response to which Clark said, "Well, who was driving," and defendant responded, "Is that really important right now? Someone stuck in the car." When the officer persisted, defendant said, "I was driving if that's going to help you get her out of the car." When asked about the statements that he made in the back of the police car, defendant explained that "[he] actually thought [he] was the driver" because he usually drove when he was with Richmond, and he only realized that he was not the driver when Richmond told him the following day. Defendant acknowledged that the statements immediately following the accident were "untrue" and explained that he made those "untrue" statements because he was "discombobulated" as a result of the crash. Defendant testified that, after realizing that Richmond was the driver, he tried to contact Clark to clarify that Richmond—not defendant—was driving at the time of the crash, and when Clark did not respond, defendant reached out to the deputy chief, who then had Clark contact defendant.

Defendant was eventually charged and convicted by a jury of OWI, third offense. Defendant was sentenced to jail for time served (176 days) and 36 months' probation.

On October 24, 2024, defendant moved for a *Ginther*[1] hearing, arguing that his trial counsel was ineffective for not introducing a portion of Richmond's medical records showing that she told the ambulance technician on the night of the accident that she was the driver. Defendant argued that this evidence "was crucial" to his defense because the prosecution argued during closing that Richmond only told the doctors that she was the driver after she found out that defendant was in jail, and evidence that Richmond told the ambulance technician would have established that Richmond said that she was the driver *before* she heard that defendant was in jail.

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Attached to this motion was an excerpt from Richmond's medical records that contained the following "Narrative History" from the ambulance technician:

> Arrive to pt suburban on its side in a wood fence. Pt states she was driver, but it was proven while on scene that she was not. We arrive to fd taking off windshield in order to get pt out of vehicle. She was standing and conscious. Once she ambulated out of vehicle, she was walked around to gate and that's where we met her. We got her on cot and to the ambulance. . . .

Also attached to defendant's motion was an affidavit signed by his trial counsel, Jennifer E. Fields, in which she averred that she was not aware that Richmond's medical records documented that Richmond told the ambulance technician that Richmond had been driving before the accident. Fields further averred that she would have presented this evidence had she known about it because it was "very important" to defendant's defense.

The trial court granted defendant's request for a *Ginther* hearing. At that hearing, Fields testified that, during closing, the prosecution "made a big deal" about the fact that Richmond could have found out that defendant was in jail before she told hospital staff that she was the driver. With respect to Richmond's statement to the ambulance technician, Fields testified that she received Richmond's medical records but must have "overlooked" the relevant document. Fields agreed that this was "simply an oversight." According to Fields, this document reflected that "Richmond told EMT workers that she was the driver."

In a ruling from the bench, the court denied defendant's motion for a new trial. The court opined that Fields' failure to present the relevant portion of the ambulance records could not be considered trial strategy because Fields admitted that it "was an omission rather than a decision to not pursue a certain avenue of defense." But the court concluded that defendant was not prejudiced by his trial counsel's omission in part because the ambulance technician's report was not all favorable to defendant—in it, Richmond told the ambulance technician that Richmond was the driver, but the report then states that this was disproven while on the scene. The court did not see a way in which the helpful statement could come in while excluding the harmful statement. The court also noted that the jury heard from both Richmond and defendant that Richmond was the driver, and the jury had to compare that to the videos from the night of the accident in which defendant made "incriminating statements" implicating that he was driving. The court concluded that, on this record, the failure to admit the ambulance technician's report did not prejudice defendant.

This appeal followed.

## II. STANDARD OF REVIEW

"[W]hether a defendant has been denied effective assistance of counsel is a mixed question of fact and law—the trial court's factual findings supporting its decision are reviewed for clear error, while the court's determination of whether those facts violated the defendant's right to the effective assistance of counsel is reviewed de novo." *People v Haynes*, 338 Mich App 392, 429; 980 NW2d 66 (2021).

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

To prevail on an ineffective assistance claim, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). When judging the reasonableness of trial counsel's performance, this Court must consider whether it was the result of trial strategy. See *People v Bass*, 317 Mich App 241, 278; 893 NW2d 140 (2016). If so, the defendant's ineffective-assistance claim becomes more difficult to prove because trial counsel is given "wide discretion" when it comes to matters of trial strategy, *id*. (quotation marks and citation omitted), "and this Court will not substitute its judgment for that of counsel" on such matters, *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002), nor will it assess the reasonableness of a chosen strategy using the "benefit of hindsight," *People v Unger*, 278 Mich App 210, 243; 749 NW2d 272 (2008).

Deciding what evidence to present is generally considered a matter of trial strategy, see *Davis*, 250 Mich App at 368, but this is not always true. A trial strategy is reasonable only to the extent that it is supported by professional judgment. *Trakhtenberg*, 493 Mich at 52. If counsel does not present certain evidence because they did not know about the evidence due to their failure to conduct a reasonable investigation, then the decision to not present the evidence cannot have been the result of sound trial strategy. See *id*. at 53-54. And this Court's deference to matters of trial strategy does not apply to strategies that are not in fact sound because doing so would allow an unreasonable performance to be insulated under the guise of "calling it trial strategy." *People v Douglas*, 496 Mich 557, 585; 852 NW2d 587 (2014) (quotation marks and citation omitted).

Here, Fields admitted that she did not present Richmond's favorable statement in the ambulance technician's report because she did not know about it. Fields had the records in her possession, and it appears that she simply failed to review them carefully and locate Richmond's statement. Given Fields' admission that she simply did not know about the beneficial statement, her failure to move for its admission cannot be said to have been the result of reasonable trial strategy. Fields apparently conducted a less-than-full investigation of the report and missed Richmond's statement, so her "decision" to not admit it was not the result of trial strategy. We accordingly conclude that it was objectively unreasonable for Fields to not discover Richmond's beneficial statement in Richmond's medical records and move for the statement's admission.

Still, Fields' performance cannot be deemed unreasonable if Richmond's statement in her medical records was not, in fact, admissible because counsel cannot be deemed ineffective for failing to take "meritless or futile" positions. *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015). So, the question becomes whether this statement was admissible. Defendant concedes that Richmond's statement in the ambulance technician's report is hearsay, and hearsay is inadmissible absent an exception. MRE 802. Defendant contends that Richmond's statement in the ambulance technician's report is admissible as an exception to the bar against hearsay as either a present sense impression under MRE 803(1) or an excited utterance under MRE 803(2). But, later in his brief, defendant contends that the statement in the report that was harmful to defendant—that "it was proven while on scene that [Richmond] was not" the driver—would not be admissible because it "is pure hearsay" without an exception. Defendant is correct insofar as every statement that the ambulance technician made in her report is hearsay. But the portion of

the report that defendant wants admitted is the ambulance technician's statement about what Richmond said, making Richmond's statements hearsay within hearsay.

"Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." MRE 805.[2] Defendant has proffered an explanation for why Richmond's statement in the report would be admissible, but he never explains why the ambulance technician's statement about what Richmond said would be admissible. This puts defendant in a catch-22—either the ambulance technician's statements in her report fit within a hearsay exception, and Richmond's hearsay statements within the report may therefore be admissible (as defendant contends) as hearsay within hearsay, or the ambulance technician's statements in her report do not fit within any hearsay exception (as defendant contends), so Richmond's hearsay statements within the report are not admissible. Because defendant's appeal hinges on Richmond's statements being admissible, we will assume that the entire report was admissible—both the portion of the statement beneficial to defendant and the portion that is harmful.

With the assumption that Fields could have had Richmond's beneficial statement admitted, we conclude that Fields' failure to locate the statement in Richmond's medical records and have the statement admitted constituted objectively unreasonable performance. Evidence clearly establishing that Richmond told others that she was the driver of the crashed vehicle immediately after the crash bolstered Richmond's testimony that she was, in fact, the driver. This in turn went to the heart of defendant's defense—that he was not driving the vehicle while intoxicated. The question then becomes whether defendant was prejudiced by Fields' performance. We conclude that he was not.

Defendant emphasizes that Richmond's statement that she was the driver in the ambulance technician's report was significant because it showed that Richmond claimed to be the driver before she learned that defendant had been arrested. This timing is significant to defendant because it would have countered the prosecution's rebuttal argument about why the jury should not be persuaded by Richmond's medical records showing that she told doctors at the hospital that she was the driver. During rebuttal, the prosecution argued in relevant part:

> Medical records, I'll explain that for you. We know, based upon Shurrone Richmond's testimony, you saw the video, you'll get a copy of her testimony to take back into chambers if you want—or into the jury room. I can explain that. "One of his friends called me when I was in the emergency room in the hospital." She knew Stephen Kyles was in jail that night, so that's pretty easy to explain that. She can tell—easily tell that to the doctor, that she was the driver, because she knew Stephen had been arrested that night.

Defendant is correct that Richmond's medical records showing that she claimed to be the driver when speaking with the ambulance technician would rebut this argument.

---

[2] This was the version of MRE 805 in effect at the time of defendant's trial. It has since been amended, though the changes were not substantive.

But the jury already heard that Richmond told "the ambulance drivers" that she was the driver—she testified to this at the preliminary hearing in the following exchange:

> *Q.* Did you take any steps to let PSO Clark know that you were driving prior to him coming to you??
>
> *A.* I think at one point, yeah, I talked to him on the phone and I told him I was driving. I don't remember exactly when.
>
> *Q.* When was that?
>
> *A.* I don't remember exactly when.
>
> *Q.* Okay.
>
> *A.* But I informed the ambulance drivers and the—and the hospital of the accident what happened, because they asked me what happened.

While Richmond's statement could be clearer, the substance of the testimony in context is clearly that Richmond told "the ambulance drivers" that she was the driver. Given that the jury already heard this testimony, it is unclear how the jury hearing the same evidence in the form of the ambulance technician's report would have likely changed the outcome at defendant's trial. In other words, in light of Richmond's above testimony, defendant cannot establish that he was prejudiced by Fields' failure to admit the ambulance technician's report.

Even if the jury did not interpret the above testimony as Richmond claiming that she told "the ambulance drivers" that she was the driver, admitting Richmond's statement in the ambulance technician's report would not have made a difference at defendant's trial. It is unlikely that convincing the jury that defendant was not the driver of the vehicle hinged on clarifying precisely when Richmond first claimed that she was the driver. Rather, convincing the jury that defendant was not the driver hinged first and foremost on convincing the jury to disregard defendant's numerous acknowledgements on the night of the accident that *he was the driver*. The jury saw video of defendant's numerous incriminating statements on the night of the crash, including defendant saying "I'm going to jail for drinking and driving, I have to accept that," "I fucked up" several times, and "I ain't gonna lie to you bro, I know I fucked up because I still got behind a wheel and I'm still drinking." The jury also heard defendant repeatedly say that he crashed the car because another car turned in front of him and he had to avoid hitting it.

At his trial, defendant attempted to explain away these incriminating statements, testifying that, on the night of the crash, he truly believed that he was the driver because he was "discombobulated," and he only realized that he was not the driver after talking to Richmond the following day. The jury clearly did not believe this testimony—or Richmond's testimony that she was the driver—because it found defendant guilty.

There is simply not a reasonable probability that this would have changed if the jury had seen the ambulance technician's report in which Richmond claimed to be the driver before being transported to the hospital. Hearing this may have slightly bolstered Richmond's testimony because it would have countered the prosecution's argument that Richmond only claimed to be the

driver after she heard that defendant was in jail. One could also argue that the more credible the jury found Richmond, the more likely the jury was to credit defendant's explanation for why he claimed to be the driver on the night of the crash. That said, evidence that merely bolstered Richmond's testimony would have made little difference. The jury had already heard Richmond's testimony that she was the driver, and it heard defendant's testimony confirming the same and attempting to explain why he said something different on the night of the accident. The jury chose not to credit any of this testimony, instead crediting defendant's numerous statements from the night of the accident in which he admitted that he was driving the vehicle when it crashed. Hearing that Richmond claimed to be the driver earlier would have done little to convince the jury that defendant was "discombobulated" when he repeatedly admitted to being the driver on the night of the accident.

It also cannot be ignored that, if Richmond's favorable statement in the report came into evidence, the jury would have also heard the other portion of the report in which the ambulance technician wrote that "it was proven while on scene that [Richmond] was not" the driver. The report was therefore not entirely helpful to defendant, and in fact could have hurt defendant's case. Defendant emphasized during trial that none of the officers spoke to Richmond on the night of the accident despite her claiming to be the driver, but the ambulance technician's report explained why that was—because "it was proven while on scene that [Richmond] was not" the driver.

In sum, to any extent that Richmond's statement in the ambulance technician's report was not cumulative of her testimony at the preliminary examination, the statement, at most, only slightly bolstered Richmond's claim that she was the driver. That Richmond claimed to be the driver was not new; the jury already heard Richmond's testimony to that effect and found it not credible. And hearing that Richmond made this claim earlier would do little to overcome the most incriminating evidence against defendant—his repeated statements on the night of the crash that he was the driver of the vehicle. We therefore conclude that, while Fields performed unreasonably by failing to carefully review Richmond's medical records and locate the bolstering statement in the ambulance technician's report, the failure to present this evidence at trial did not prejudice defendant.

Defendant also contends that his trial counsel was ineffective because she did not request that the trial court's questioning of Richmond during the preliminary examination be redacted "from the transcripts and video." Defendant does not contest that the court's questions and Richmond's answers were relevant, and they clearly were. The court's questioning focused on establishing a clear timeline of when Richmond learned that defendant had been arrested, which led to the court questioning Richmond as to why she did not go to the police and tell them that she was the driver as soon as she learned that defendant had been arrested and charged with OWI.

Defendant contends that his trial counsel should have moved to have this questioning redacted because the "court asked multiple leading questions and then expressed skepticism and doubt in Ms. Richmond's answers." This alleged conduct, defendant opines, breached the veil of judicial impartiality, so Fields could have successfully objected to having the jury see it. We conclude that the trial judge's conduct did not pierce the veil of judicial impartiality, so Fields could not move to have the video and transcript of the trial court's questioning of Richmond redacted on that ground.

A judge's conduct pierces the veil of impartiality "and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *People v Stevens*, 498 Mich 162, 171; 869 NW2d 233 (2015). A judge can pierce the veil of judicial impartiality by improperly questioning witnesses, but "a reviewing court must first bear in mind that such interrogation is generally appropriate under MRE 614(b)." *Stevens*, 498 Mich at 173. Pursuant to this rule, it is proper "for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information," *id*., but it is improper for a judge to ask questions "designed to emphasize or expose incredible, unsubstantiated, or contradictory aspects of a witness's testimony," *People v Swilley*, 504 Mich 350, 374; 934 NW2d 771 (2019). A questioning judge must also carefully police their "tone and demeanor" because jurors are highly susceptible to following a judge's "bias or prejudice," no matter how slight. *Stevens*, 498 Mich at 174. A reviewing court should also "consider the scope of judicial intervention" and "the extent to which a judge's comments or questions were directed at one side more than the other." *Id*. at 176-177. Lastly, reviewing courts should consider what effect "the presence or absence of a curative instruction" may have played in curing any potential appearance of judicial impartiality. *Id*. at 177.

The trial court's questioning of Richmond took place during a preliminary examination. The examination of witnesses during a preliminary examination must be conducted "in accordance with the Michigan Rules of Evidence," MCR 6.110(C), and those rules allow trial courts to "examine a witness," MRE 614(b). Part of the court's questioning of Richmond focused on eliciting fuller and more exact testimony—the court sought to have Richmond clarify the timeline of events on the night of the crash, with a particular focus on when Richmond found out that defendant had been arrested. A different part of the court's questioning focused on eliciting additional relevant information—the court sought to have Richmond explain why she did not go to police and tell them that she was the driver when she discovered the defendant had been charged with OWI. The trial judge never sought to "emphasize or expose incredible, unsubstantiated, or contradictory aspects of a witness's testimony." *Swilley*, 504 Mich at 374.

As for the trial judge's tone and demeanor, our Supreme Court in *Stevens* recognized that "appellate courts typically do not have the benefit of viewing a trial judge's tone and demeanor," *Stevens*, 498 Mich at 176, but that is not true in this instance because this Court has the video of the preliminary examination that the jury saw. Having reviewed that video, we discern nothing improper about the trial judge's general tone and demeanor. Defendant argues that the judge "expressed skepticism and doubt in Ms. Richmond's answers," and the judge's "tone and demeanor was one of disbelief." It is unclear to what defendant is referring, however, because he does not identify where in the video or transcript the trial judge purportedly acted as defendant claims. The only possible instance in which the trial judge expressed any doubt about Richmond's answers was when she testified that it took "[p]robably two or three minutes" to get her out of the car and transport her to the ambulance. Notably, however, after the judge expressed its doubts about this rather irrelevant testimony, Richmond agreed that it likely took longer than she initially estimated. Other than that, however, the judge's tone and demeanor were neutral.

Defendant also claims that the trial judge "dismissively waived his hand at Ms. Richmond in disbelief at the conclusion of" his questioning, which is not a wholly unreasonable characterization of the judge's actions. That said, the trial judge did this at the end of his

questioning of Richmond, and he could have just as easily been raising his hand as a way of physically signaling that he was done with his questions as he said, "Okay. I've got nothing else. Anything else [prosecutor]?" This is not to say that the trial judge's conduct was necessarily proper, only that it was open to interpretation.

Regardless, to any extent that the trial judge's tone and demeanor could have slightly crossed the line at times, the judge's tone and demeanor were generally neutral, his questions were proper, limited, and did not favor one side over the other, and the jury was instructed that it should not interpret the court's comments or questions as reflecting the judge's opinion about the case. During closing instructions, the court instructed the jury that it was the jury's sole responsibility to decide the facts of the case based on the admitted evidence, that the court's "comments, rulings, questions, and instructions are . . . not evidence," and that, if the jury believed that the court had "an opinion how [the jury] should decide this case, [the jury] must pay no attention to that opinion." On this record, considering the totality of the circumstances, it was not reasonably likely that the trial judge's "conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Stevens*, 498 Mich at 171. The trial judge therefore did not pierce the veil of judicial impartiality, and it was not objectively unreasonable for Fields to not ask that the court's questioning of Richmond be redacted on that ground because the failure to raise a meritless objection cannot constitute ineffective assistance. *Putman*, 309 Mich App at 245.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Kathleen A. Feeney
/s/ Randy J. Wallace